HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HANEET KUMAR, et al.,

          Plaintiffs,

     v.

WILLIAMS PORTFOLIO 7, INC.,

          Defendant.

CASE NO. C14-657RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on a motion for partial summary judgment from Defendant Williams Portfolio 7, Inc. ("Williams").  No party requested oral argument and the court finds oral argument unnecessary.  For the reasons stated below, the court DENIES the motion (Dkt. # 29), but does so without prejudice to limiting the opinion testimony of certain witnesses upon a proper motion in limine.  The court places restrictions on the testimony of some of Plaintiffs' witnesses, including an order that Dr. Scott McMahon will not testify unless Plaintiffs comply with this order and the court rules some portion of his testimony admissible.  The court reminds the parties of their obligation to meet and confer before filing motions in limine.  Local Rules W.D. Wash. LCR 7(d)(4).

## II.  BACKGROUND

Plaintiffs Haneet and Neerupma Kumar and their minor son have sued the owners of the Bellevue apartment complex in which they lived from May 2011 to either March

ORDER – 1

or May 2012.[1]  They claim violations of the Washington Residential Landlord Tenant Act, breach of their lease with Williams and the lease's implied warranty of habitability, and negligence.  The focus of all of those claims is the Kumars' assertion that there was mold in their apartment unit and that the mold has caused them adverse health impacts.

To prove their claims, the Kumars intend to rely in part on testimony from people with specialized knowledge.  They will rely on testimony from 911 Restoration, a company who they hired in March 2012 to test their apartment for airborne mold.  They will also rely on testimony from EMLab, a laboratory who tested samples from 911 Restoration to assess the presence of mold spores.  They will also rely on testimony from several treating medical providers.  They include Dr. David Buscher, a Seattle-area physician specializing in environmental medicine, Dr. Alfred Johnson, a Texas internist, and Dr. Scott McMahon, a New Mexico pediatrician.  Dr. Buscher, who began treating the Kumars in August 2012, ordered a lab to test their urine for the presence of mold.  So far as the record reveals, none of these witnesses provided a written expert report in compliance with Federal Rule of Civil Procedure 26(a)(2)(B), which is to say that none of them have been designated as witnesses "retained or specially employed to provide expert testimony in the case . . . ."

Williams asks the court to exclude all of the opinion testimony listed above.  It asks the court to exclude testimony from 911 Restoration about its testing, to exclude testimony from EMLab about its analysis of 911 Restoration's testing, to exclude the urinalyses, and to exclude testimony from all three physicians that the Kumars have health issues caused, at least in part, by their exposure to mold.  Williams relies on Federal Rule of Evidence 702, which permits a witness "qualified as an expert by knowledge, skill, experience, training or education" to offer relevant opinion testimony, provided it is "based on sufficient facts or data," and is the "product of reliable principles

---

[1] There is evidence that the Kumars moved into a new apartment in March 2012, although they used their unit in the Williams complex at least to store their furniture until May 2012.

ORDER – 2

and methods" that are "reliably applied . . . to the facts of the case." The trial judge must act as a gatekeeper to prevent the jury from considering unreliable testimony, applying standards that the Supreme Court applied to scientific testimony in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and later to opinion testimony based on technical or other specialized knowledge in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Those cases and their progeny compel the court to make "gateway determinations" regarding the relevance and reliability of challenged expert testimony. *Barabin v. AstenJohnson, Inc.*, 700 F.3d 428, 433 (9th Cir. 2012). Williams contends that the principles of *Daubert* and its progeny dictate the exclusion of all of the Kumars' experts' testimony. Williams argues that once that testimony is excluded, there will be no genuine issue of material fact as to any claim that requires the Kumars to prove that mold at the apartment caused them medical injury.

### III.   ANALYSIS

Williams styles its motion as one for summary judgment, but the standard that applies to a summary judgment motion is in some respects a poor fit for the inquiry it asks the court to conduct. On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must initially show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). The court defers to neither party in resolving purely legal questions. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

ORDER – 3

In a so-called "*Daubert* hearing," however, the court considers facts without the one-sided strictures that apply in a summary judgment motion.  No "hearing" is necessary, and the court has discretion to conduct whatever procedures are necessary to investigate the reliability of opinion testimony.  *United States v. Alatorre*, 222 F.3d 1098, 1103-04 (9th Cir. 2000).  The court has discretion to make the *Daubert* determination via any procedure that gives it an adequate record.  *In re Hanford Nuclear Reservation Litig.*, 329 F.3d 1124, 1138-39 (9th Cir. 2002).

With these standards in mind, the court summarizes its rulings:

1) The airborne mold sampling of 911 Restoration, the analysis of those samples by EMLab, and the laboratory urinalyses that Dr. Buscher ordered for the Kumars are data obtained by reliable methods, and the court will not exclude testimony about those data.  Williams may challenge the testing protocols that these experts used on cross-examination or through its own expert witnesses, but there is no basis to exclude testimony about them.  The one exception is that the court will not permit EMLab to testify as to its "MoldSCORE" figures unless, at a minimum, the Kumars comply with this order.

2) Dr. Buscher and Dr. Johnson may offer only the opinions they formed in the course of their treatment of the Kumars.  If Dr. McMahon testifies, he will be subject to the same restriction, but he may not testify at all unless the Kumars make disclosures in compliance with this order.

3) The court does not rule out that it will further limit the testimony of any of these witnesses upon a proper motion in limine from Williams.  If necessary, the court may hold a hearing outside the jury's presence immediately before the beginning of trial on August 24.

4) Because the admissible testimony of these witnesses and others create a genuine issue of fact as to whether mold exposure at the Williams

ORDER – 4

apartment caused the Kumars' medical injuries, the court will not grant partial summary judgment.

**A.      The Testing Data is Reliable, With One Possible Exception.**

911 Restoration took air samples from the Williams apartment unit in March 2012. Williams, through its experts, provides evidence that 911 Restoration should have taken additional samples, including samples on different days.  That is perhaps valid criticism, but that does not undermine that 911 Restoration took two samples (one from inside the apartment, one from outside) and sent the samples to EMLab for testing.  The court finds no basis to exclude the samples as unreliable.

EMLab, in turn, analyzed the samples to determine the concentration of mold. The Williams experts offer evidence that those concentration figures are no greater than normal and offer other criticisms of the testing protocol.  They are free to raise those issues at trial, just as they are free to point out that the test results show nothing abnormal.  The court finds no basis to exclude the testing results (by which the court means the measured concentration of airborne mold) as unreliable.

EMLab also, however, offered what it calls a "MoldSCORE" along with its raw test results.  The court can only guess what a "MoldSCORE" is, but it appears to be an assessment of how likely it is that mold spores originated from inside the tested area. Testimony from EMLab representative Michelle Seidl raises concerns that EMLab has not revealed either a methodology for calculating "MoldSCORE" or a basis for claiming that the "MoldSCORE" is a reliable basis for assessing anything.  For that reason, if the Kumars wish to offer evidence about the "MoldSCORE" at trial, EMLab must provide a declaration disclosing how "MoldSCORE" is calculated and the basis for asserting that "MoldSCORE" is a reliable assessment of the likelihood that mold spores originated inside a living space, or is a reliable assessment of something else.  The Kumars must provide that evidence to Williams by noon on July 28.  Nothing prohibits Williams from moving, in limine, to exclude "MoldSCORE" evidence in light of that disclosure.

ORDER – 5

Finally, Dr. Buscher ordered urinalysis to determine the presence of mycotoxins (toxins associated with mold) in each of the Kumars. The Williams experts' criticisms of the results of that urinalysis do not undermine the reliability of the test results. They instead question whether those test results are meaningful assessments of anything relating to the Kumars' exposure to mold in the apartment or as to their health. They argue, for example, that the tests occurred long after the Kumars left the Williams apartment, meaning that any mycotoxins present in their urine came from a source other than the apartment. They can present that evidence at trial, but it does not undermine the urinalyses as sufficiently reliable indicators of the presence of mycotoxins in urine. What conclusions to draw from the presence of mycotoxins in urine is a different question, but one that has nothing to do whether the urinalysis results are admissible.

The court observes that the air and urine testing show, at most, the presence of mold or mycotoxins in the Kumars' apartment and in their urine. As to the presence of mold in the Williams apartment, the Kumars likely do not need expert testimony. They have their own testimony, photographs, and documentary evidence to show the presence of visible mold. Moreover, the presence of mold in their apartment (or in their urine a few months after they moved out of their apartment) does nothing to rule out that they were exposed to mold in other places, and it is at most a first step toward proving that mold caused them any medical injury.

**B.   Dr. Buscher and Dr. Johnson May Testify As to Opinions They Formed in the Course of Treating the Kumars.**

In contrast to the test results discussed above, which do little more than demonstrate the presence of mold or mycotoxins on a particular date, it is medical testimony from the Kumars' physicians that they will rely on to prove that exposure to mold caused their medical injuries. In considering whether to admit that testimony, the court must consider any factor bearing on its reliability, including whether the hypothesis the expert advances can be or has been tested, whether it has been subjected to peer

ORDER – 6

1    review and publication, potential error rates, and whether the hypothesis is generally

2    accepted in the scientific community. *Barabin*, 700 F.3d at 431. Those factors are not

3    exclusive. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The list of factors was

4    meant to be helpful, not definitive, and the trial court has discretion to decide how to test

5    an expert's reliability as well as whether the testimony is reliable, based on the particular

6    circumstances of the particular case.") (internal quotations and footnotes omitted).

7        Williams argues that there is no basis to conclude either that mold or mycotoxins

8    cause adverse health effects in general or that mold or mycotoxins caused adverse health

9    effects in the Kumar family. To support that argument, it relies on its own experts, who

10   offer evidence that there is no consensus in the scientific community that mold or

11   mycotoxin inhalation causes adverse health effects. They also point to a variety of

12   reasons that there was no basis to conclude that the Kumars themselves suffered adverse

13   health effects as a result of mold exposure, and that even if there were such evidence,

14   there is insufficient evidence that the exposure occurred at the Williams apartment.

15   Based on that expert testimony, Williams asks the court to prevent the Kumars'

16   physicians from offering any testimony about the cause of their allegedly ill health.

17       Dr. Buscher, the first physician to diagnose the Kumar family with mold-induced

18   illnesses, agrees that there is no scientific proof that mold induces ill health. He notes,

19   however, that there is no scientific proof that mold does not induce ill health. His

20   assessment of the Kumars is based on his own substantial experience in treating patients

21   with exposures to mold whose health improves when they eliminate mold exposure and

22   purge mycotoxins from their bodies. Cornelius Decl. (Dkt. # 35), Ex. 23 (Buscher Depo.

23   at 48) ("I know for sure that [mold and mycotoxins] cause health effects on people. . . .

24   I'm relying on exposure history, symptoms that are consistent, exposure in hundreds of

25   patients and the fact that they get better when they remove themselves from it or remove

26   mycotoxin from their system.").

27

28   ORDER – 7

1   The court uses Dr. Buscher's opinions to illustrate the essence of the difference of

2   opinion between the Kumars' physicians and Williams's expert witnesses.  Scientists

3   (including physicians) assessing whether mold causes illness have reached no consensus.

4   Some physicians who treat patients, using accepted methods of differential diagnosis,

5   have reached the opinion that mold exposure causes or contributes to causing adverse

6   health impacts.  Those opinions are not necessarily contradictory.  Indeed, Dr. Buscher

7   *agrees* with Williams' experts as to the lack of scientific consensus that mold causes ill

8   health.  Cornelius Decl. (Dkt. # 35), Ex. 23 (Buscher Depo. at 47-48).  Differential

9   diagnosis is a "common scientific technique" that is generally admissible under *Daubert*.

10  *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1057 (9th Cir. 2003).  It requires the

11  compilation of a set of competing causes that are generally capable of causing a patient's

12  symptoms followed by a process of elimination to narrow those causes down.  *Id.* at

13  1057-58.  As the court has noted, there is no evidence of a scientific consensus that mold

14  does not cause illness.  Although scientific consensus as to whether a particular exposure

15  is a general cause of a type of medical injury is an indicator of reliability, it is not a rigid

16  prerequisite to a finding of reliability.  *Daubert*, 509 U.S. at 588.

17  Absent a consensus in peer reviewed literature, one way or the other, as to whether

18  mold causes illness, the court will not prohibit the jury from hearing Dr. Buscher's

19  opinions that mold is a general cause of some adverse health impacts.  That testimony is

20  based on Dr. Buscher's substantial experience treating many patients exposed to mold

21  and in discussing and reviewing cases involving many more patients.  That testimony is

22  sufficient to reliably indicate that mold may be a general cause of adverse health impacts.

23  It is far from conclusive, and a jury may reject it, but the court will not preclude the jury

24  from reaching the question.

25  As to the second step of the differential diagnosis, the court will not prevent the

26  jury from hearing evidence from the Kumars' physicians as to their application of

27  established techniques of differential diagnosis to determine whether they have suffered

28  ORDER – 8

ill health effects as a result of exposure to mold. *Primiano*, 598 F.3d at 566 ("Where the foundation is sufficient, the litigant is entitled to have the jury decide upon [the experts'] credibility, rather than the judge.") (internal quotation omitted, alteration in *Primiano*). Williams has, to be sure, pointed to numerous weaknesses in the Kumars' physicians' application of differential diagnosis techniques to the Kumars. The court expresses no view on how a jury might view that evidence. It merely rules today that the jury will hear that evidence. *See id.* at 564 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").[2]

The Kumars' reliance on their treating physicians raises another issue. Experts specially retained to offer opinions for the purpose of litigation must disclose those opinions in an expert report that complies with Rule 26(a)(2)(B). Other experts, like treating physicians, may offer expert testimony without first disclosing an expert report. *Goodman v. Staples the Office Superstore, LLC*, 644 F.3d 817, 824 (9th Cir. 2011). But an expert cannot use her status as a treating physician to avoid the strictures of Rule 26(a)(2)(B). A "treating physician is only exempt from Rule 26(a)(2)(B)'s written report requirement to the extent that his opinions were formed during the course of treatment." *Goodman*, 644 F.3d at 826. Both Dr. Buscher and Dr. Johnson[3] offer substantial

---

[2] The court has confined its discussion to the admissibility of expert testimony from the Kumars' physicians. It has not mentioned the Kumars' attempt, in opposition to Williams's summary judgment motion, to rely on other sources of "evidence" as to whether mold causes illness. That "evidence" includes Washington's requirement that landlords provide their tenants with disclosures about mold, a 2008 report from the Government Accountability Office regarding indoor mold, various other reports on mold, information downloaded from the internet, and (as nearly as the court can discern) the Kumars' counsel's opinions regarding positions taken by various scientific bodies. The court need not decide whether any of that "evidence" would be admissible at trial, and no one should read the court's declination to discuss it further as expressing an opinion on its admissibility.

[3] Dr. Johnson treated the Kumars after they moved from Washington to Texas. There is little evidence in the record from him. As nearly as the court can tell, he considered records from Dr. Buscher and believed his opinions to be consistent with his own experience and the Kumars' physical condition when he treated them. The court does not rule out the possibility that Williams could successfully move to exclude or limit his testimony on causation, but it will not do so on the limited record before it.

ORDER – 9

testimony that plainly consists of opinions formed during the course of their treatment. The court cannot say the same of the testimony of Dr. McMahon.

## C.   Dr. McMahon May Not Testify At All Unless the Kumars Comply With This Order.

The evidence suggests that Dr. McMahon intends to offer opinion testimony that goes well beyond the disclosure of opinions he formed during treatment of the Kumars. To begin, he did not start to treat the Kumars until April 18, 2015.  Nonetheless, the Kumars disclosed him as an expert witness on April 3, 2015, as the court learned when Williams previously filed a motion to exclude his testimony as untimely disclosed.  Dr. McMahon formed the opinion that mold caused the Kumars' symptoms before he ever treated them, as the March 31, 2015 report that the Kumars disclosed on April 3 reveals. That report also reveals that in addition to opinions he formed about the Kumars before he ever treated them, he had also formed opinions about mold and its impact on human health before he treated them.  In a May 25, 2015 order, the court ruled that Dr. McMahon's March 31 report was "plainly not the report of a treating physician."  May 25 ord. (Dkt. # 28) at 2.  The court excluded the opinions Dr. McMahon, although it "d[id] not rule out the possibility that Plaintiffs may supplement discovery with evidence of their treatment with Dr. McMahon."  *Id.* at 2.

The Kumars and Dr. McMahon paid little attention to the May 25 order.  In conjunction with the Kumars' opposition to the motion before the court, he submitted an undated 56-page "Declaration" that is in reality another untimely expert report.  Dkt. # 36.  The vast majority of that report does not mention the Kumars.  The section addressing his treatment of the Kumars (treatment apparently confined to a single in-person examination and a few follow up telephone calls) occupies just 6 pages of the report.  The remainder is devoted to Dr. McMahon's overview of scientific literature, his criticisms of various studies questioning the link between mold and illness, and his own opinions about that link.

ORDER – 10

Dr. McMahon has expressed opinions that he did not form during the course of treating the Kumars.  As noted, those opinions appear to be the vast majority of what he intends to testify about at trial.  Because the Kumars persist in attempting to use Dr. McMahon as a specially-retained expert witness, the court rules that Dr. McMahon will not testify unless they take the following steps.  They must identify a specific list of opinions that Dr. McMahon formed *in the course of treating the Kumars*.  They must produce that list to Williams no later than July 28 at noon.  Williams is free to move to exclude any of those opinions.  If the summary that the Kumars prepare does not reflect a good faith effort to comply with the court's order that Dr. McMahon will not testify except in his capacity as a treating physician, the court will impose sanctions that will include, at a minimum, an order that they pay Williams's attorney fees for its efforts to exclude Dr. McMahon's untimely-disclosed testimony.

## IV.  CONCLUSION

For the reasons stated above,[4] the court DENIES Williams's motion for partial summary judgment (Dkt. # 29), although it places restrictions on the Kumars' experts' testimony as described above.  The court's ruling today is without prejudice to further limiting the opinion testimony of the Kumars' expert witnesses upon a proper motion in limine.  The court reminds the parties of their obligation to meet and confer in accordance with LCR 7(d)(4).

DATED this 23rd day of July, 2015.

The Honorable Richard A. Jones
United States District Court Judge

---

[4] The Kumars assert that Williams is equitably estopped from "disputing or challenging the 911 Restoration and EMLab . . . test results, and Plaintiffs' medical evidence."  Pltfs.' Opp'n at 22.  The court summarily rejects that argument.

ORDER – 11